**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Keith MacConnell,
Myquon Media, LLC,
Sonic Automation, LLC,
and Heather McGough

     v.                            Civil No. 07-cv-369-JM

City of Nashua, Nashua
Police Department, and
Jeffrey Maher, Kerry Baxter
and Dennis Linehan, in their
Individual and Official
Capacities

**O R D E R**

Plaintiffs commenced this action in state court asserting

multiple state court claims and two constitutional claims under

42 U.S.C. § 1983, based on defendants' alleged improper arrest of

plaintiff Keith MacConnell ("MacConnell") and subsequent search

and seizure of his property without probable cause.  Defendants

removed the action to this court based on the federal questions

presented, and now move for summary judgment on the four counts

asserted by MacConnell.  Plaintiff objects.  After carefully

reviewing the facts and arguments before the court, defendants'

motion (document no. 10) is granted.

## Discussion

### 1. **Background Facts[1]**

Plaintiffs are MacConnell and his girlfriend, Heather McGough ("McGough"), who operated a business under the names of plaintiffs Myquon Media, LLC ("Myqon") and Sonic Automation, LLC ("Sonic"). MacConnell sold industrial "CNC routers," which were used to create signs.[2] He imported the routers from China and sold them to customers throughout the United States by marketing them over the internet and accepting purchase orders on his website. He operated the business from a condominium located at 53 Burgundy Way in Nashua, New Hampshire, where MacConnell lived and which McGough owned. MacConnell stored the routers in a warehouse he referred to as the "Law Warehouse," located at 27

---

[1]The background facts stated here are undisputed and taken from either the exhibits to Defs.' M. for Summ. J. (document no. 10) or Pl.'s Obj. to Def.'s M. for Summ. J. (document no. 14), including the various search and arrest warrant applications, MacConnell's March 14, 2006 statement to the police, police reports of the searches, deposition testimony and affidavits.

[2]CNC (an acronym for "computer-numerically controlled") routers are "machine tools. . . used to cut, trim and shape a wide variety of materials including wood, plastic, composites, foam, honeycomb core and non-ferrous metals into either flat or three-dimensional shaped products." See Thermwood - First in CNC Routers (2009), http://www.thermwood.com/?clid.

2

Airport Road, also in Nashua.

On October 4, 2005, a woman living in Georgia, Sherry Kown, successfully bid for a router on Ebay, for $8,5000, plus taxes and shipping costs, for a total of $9,265. She mailed "Keith"[3] a certified check for that amount in exchange for his promise to deliver the router within 22 days. When the router still had not arrived shortly before Christmas, Kown called MacConnell and was told the router was en route. The router never did arrive, but Kown's check had been cashed almost immediately. MacConnell stopped responding to Kown's phone calls and emails, and Kown discovered that MacConnell was no longer selling on Ebay.

In January 2006, Kown contacted Sonic, which appeared to be involved in the router sales, and spoke to someone named "Chris," who assured her he would look into the problem. Kown notified Ebay about her problem and was advised to file a complaint against MacConnell and Sonic with the Better Business Bureau. Ebay also separately contacted MacConnell, who explained that the routers were being shipped from overseas and were taking longer than normal to arrive. By January 31, 2006, Kown still had not

[3]Since MacConnell's first name is Keith and he admitted to the conduct complained of, I assume the factual references to "Keith" describe plaintiff MacConnell and hereinafter have substituted the name MacConnell for "Keith."

3

received the router or her money back, which prompted her to file a complaint with the Douglass County, Georgia sheriff's office. In early February 2006, the Douglass County Sheriff's Department contacted the Nashua Police Department ("NPD") to report Kown's complaint.

Similarly, on November 17, 2005, a man named Mansen Way, of Indiana, ordered a router from Sonic for a total price of $12,995. Way paid for the router with two separate checks, the first issued on November 30, 2005 for $6,000 and the second issued on December 14, 2005 for $6,995. The second check was returned to Way with instructions from MacConnell to send it to 6 Manchester Street in Nashua, New Hampshire, which is the address of the Law Offices of Sweeney & Sweeney, LLC, where McGough was employed. Both checks were cashed, yet MacConnell again did not send the router. He emailed Way that he was delayed because of problems with shipping and issues with his internet connections and warehouse. Way never received the router or a refund of his money. Way reported this to the NPD on February 8, 2006.

NPD Detective Jeffrey Maher ("Maher"), a defendant here, was assigned to investigate both complaints. After reviewing the written reports, Maher contacted both Kown and Way directly to

4

obtain more detailed information. Both individuals sent Maher copies of the cancelled checks that were sent to MacConnell and Sonic. Maher contacted the bank where the checks were deposited and was able to confirm that MacConnell had personally deposited the checks into two separate bank accounts. Because of Sonic's involvement, Maher also investigated that company. He learned that Sonic's website was set up in October 2005 and that the company was formed on November 16, 2005, the day before Way placed his order. The initial registered agent was J. Leonard Sweeney III, of 6 Manchester Street in Nashua, the same name and address as the law office where McGough worked and where MacConnell had requested Kown and Way send their checks. Sonic's current registered agent was MacConnell and its principal place of business was listed as the 53 Burgundy Drive condominium.[4]

Maher learned that Sonic's website had been formed by using a server that blocks the identity of the registrant from the domain name. The website listed its address as a post office box in Nashua that MacConnell had used since 2003 in connection with other businesses with which he had been associated. One of those businesses was American Sign Supply, LLC ("American Sign"), that

---

[4]The condominium initially was jointly owned by MacConnell and McGough and subsequently devised solely to McGough.

MacConnell began after having been fired from a former employer, Hyatt Graphic Supply ("Hyatt"), for improperly using customer funds.  MacConnell also had sold routers through American Sign, in violation of a non-compete agreement he had with Hyatt. American Sign had a series of dissatisfied customers, one of whom filed a complaint with the Better Business Bureau for non-delivery of product.  Sometime after Hyatt sued MacConnell for violating the non-compete agreement, American Sign's assets were transferred to McGough.  American Sign is now dissolved.[5]

Email correspondence between Way and MacConnell, Sonic, and someone named "Chris," revealed how MacConnell conducted his business.  On November 17, 2005, the day Way purchased his router, "Chris" told him that Sonic had only three routers in stock.  On January 10, 2006, MacConnell explained that Way's router had been shipped inadvertently to another customer but that Way would be the first to receive a router from the next

---

[5]On February 27, 2006, Maher contacted the New Hampshire Employment Security office to review its record of MacConnell's reported wages.  MacConnell's last reported income was from Hyatt in the first two quarters of 2003.  Since then, there were no other records of earnings or employment for MacConnell.  Despite this lack of earnings, MacConnell is the registered owner of a 2000 Porsche Boxster, which Maher saw parked in the driveway at the 53 Burgundy Way condominium next to McGough's 2004 Jeep Grand Cherokee.

shipment that was coming within the week.  Over the next three weeks Way tried unsuccessfully to contact MacConnell, who never replied.  After Way threatened to report MacConnell to the police on February 7, 2006, he was told the lack of communication had been caused by a faulty internet connection and that the router was in the shipping warehouse.  Way never received his router.

Way provided Maher with a report prepared by a private investigator, John Carbone, whom Way had hired to research MacConnell's business dealings.  Carbone reported that shortly after receiving the Kown and Way payments, on November 30, 2005, MacConnell bought a condominium in Laconia, New Hampshire with McGough for $185,000 from J.L. and Nancy Sweeney.  The report also identified several customers who had bought routers from plaintiffs, eleven of whom had already paid for them but not yet received them.  The nine customers in addition to Kown and Way were from various parts of the country, and all had placed their orders between September 30, 2005 and February 10, 2006.  All the customers experienced significant difficulty communicating with plaintiffs and were told that the routers were in stock but that the delayed receipt of their orders was caused by shipping problems.  None of the customers received the product ordered or

a refund of their payment.

On February 16, 2006, Maher received a referral from the National White Collar Crime Center ("NW3C"), which processes internet fraud related complaints. A man in Israel had purchased a CNC router from MacConnell through his other business involved in this action, Myquon.[6] On November 2, 2005, the customer wire transferred $9726 to the same account into which MacConnell had deposited Kown's check. Though MacConnell advised the customer that it could take up to two months to receive the router, sixteen weeks had passed without the router arriving. MacConnell responded only once to the customer's several attempts to inquire about the router, explaining that an "accident" had delayed the shipment's arrival.

A week later, on February 22, 2006, Maher was contacted by Anthony Patrinostro, of Florida, about a CNC router he had purchased from Sonic on February 2 but had not yet received. Patrinostro had initially tried to pay for the router by credit

---

[6]In the course of his investigation, Maher learned that Myquon was created in March 2005 to develop and manage online entertainment. Like Sonic, it had MacConnell as its incorporator and current registered agent, but listed J. Leonard Sweeney III, of 6 Manchester Street in Nashua as the initial registered agent.

8

card, but "Chris" stated there was a problem with the transaction and instructed him to mail a check to Sonic's post office box instead. Again the check was deposited into MacConnell's bank account but no router was received, and problems with shipping was MacConnell's proffered excuse.

Five more disgruntled customers contacted Maher, complaining about the same story of buying a router from MacConnell but not receiving the ordered router or any refund. By March 2006, Maher concluded that MacConnell had received over $85,000 for routers, none of which had been delivered to the customers. In total, eleven customer reported not having received the routers they had ordered and paid for.

Unbeknownst to Maher, on March 9, 2006, MacConnell had placed an order for six routers from his Chinese supplier, Jinan Xinhuiyou Zhongtai Advertising Co., LLC. The invoice reflects that MacConnell paid a deposit of $12,870, with the balance due upon shipment of the routers, for a total purchase price of $29,400.

Based on his investigation, Maher determined he had probable cause to believe MacConnell was committing Theft by Unauthorized Taking, in violation of New Hampshire Rev. Stat. Ann. ("RSA")

9

637:3, and Theft by Deception, in violation of RSA 637:4. Maher sought an arrest warrant against MacConnell and filed an affidavit in support thereof on March 14, 2006. Maher also obtained a warrants to search both MacConnell's residence at 53 Burgundy Way in Nashua and his bank accounts for evidence relating to the charges, and filed applications in support of those requests as well. The warrant applications were presented to and approved by Nashua District Judge James Leary on March 14, 2006.

Later that same evening defendants executed the arrest and search warrants. As MacConnell was driving up to the condominium at 53 Burgundy Way, he was stopped by the police and arrested at gunpoint, handcuffed and taken to the Nashua police station. During the search of his home, officers found a list of customers who had purchased routers from plaintiffs and $17,424 in cash in a lock box. The officers also discovered what appeared to be a rifle in a case. During his investigation, Maher learned that MacConnell had been convicted of felony larceny in Virginia in 1989. Since it is a crime under New Hampshire law for a convicted felon to possess a firearm, the search was stopped in order for Maher to apply for a second search warrant to seize

10

what appeared to be a firearm. The next day, March 15, 2006, Judge Leary issued another search warrant to search for and seize any weapons at the 53 Burgundy Way residence. Pursuant to that warrant, officers searched MacConnell's residence and seized a shotgun from the closet.

After his arrest, MacConnell was interviewed by Maher and Detective Kerry Baxter ("Baxter"), another defendant in this action. MacConnell voluntarily waived his Miranda rights and gave a statement to the police. MacConnell said that he never intended to defraud anyone and explained he was just a bad businessman. MacConnell described his difficulty capitalizing the business and the delays the lack of funds caused, because he could not afford to stock routers at his warehouse. He explained that orders had not been timely filled because a shipment of routers had been damaged. He told the police routers were stored in the Law Warehouse.

MacConnell admitted there was no employee named Chris at Sonic, and that it was a fictitious name he used for marketing and sales purposes. MacConnell explained that he actually used two pseudonyms to work the different market "platforms" for his routers. MacConnell also admitted that representations on

11

Sonic's website about awards and references were false.   He
conceded that a photograph on the website appeared to be his
place of business but was actually a building in China that he
had cut and pasted to the site.

Maher's investigation found that approximately 10-12 orders
were currently outstanding, totaling approximately $100,000 in
receipts.   MacConnell said he had only about $500 in each of his
two bank accounts and $15,000 in cash at his home.   After some
prodding by Maher, MacConnell explained that he intended to put
the cash in the bank to order more routers.   MacConnell told
Maher and Baxter that the routers were worth $4,000 each and that
he had three at the Law Warehouse, but that at least one had been
damaged in shipping.   MacConnell admitted that he did not have
the funds to process the 10-12 pending orders, although he had
already received payment for them.   MacConnell also admitted that
the money had been spent on other business expenses and personal
living expenses.

During his interview, Maher and Baxter asked if MacConnell
would consent to a search of his car and his office at 6
Manchester Street in Nashua.   After calling his attorney to
discuss the request, MacConnell consented to both searches.   The

12

officers then suspended the interview after approximately 1½ hours, because MacConnell was not feeling well and needed to take medication he had been prescribed for anxiety. MacConnell was brought to the hospital to receive the medicine and then returned to the police station very early in the morning of March 15, 2006.

Maher and Baxter resumed their interview with MacConnell at 4:25 a.m. They discussed the three routers MacConnell had in his warehouse and whether they had been too damaged in shipping to be used to fill outstanding orders. MacConnell initially said all three routers were damaged, but then said only one was too damaged to ship. MacConnell did not know how many orders he had outstanding at that time. Shortly thereafter the interview concluded.

Later that day, March 15, 2006, Maher and Baxter visited the Law Warehouse and found two of the three routers MacConnell said were there, one of which was in a badly damaged crate but appeared intact.[7] Maher also found six bills of lading dated from December 16, 2005 to February 10, 2006, which reflected

---

[7]In fact during the interview MacConnell changed his mind about the number of routers in the warehouse, clarifying there were only two.

13

shipments of routers from the Law Warehouse to various customers. Maher followed up with one customer, who stated they had waited nearly six months to receive their order and had called MacConnell every day to check on the delivery status. A second customer told Maher it had also had to wait nearly six months for the router to arrive, and when it did it was not what they had wanted or ordered. That customer and a third customer both told Maher the routers had been of an inferior quality, with instructions and software to operate the machine in Chinese, rendering them nearly useless.

Maher also executed the search warrant for MacConnell's bank records, which were sent to him on March 21 and 23, 2006. Those bank records showed that from late 2005 to early 2006 MacConnell had made six wire transfers to his Chinese supplier, Jinan Xinhuiyou Zhongtai, totaling $44,186. Maher concluded that these six transfers represented partial payment for six routers which, together with the two routers in the warehouse, were the only orders MacConnell had processed despite having received payment for approximately 16 routers. The bank records and the bills of lading showed that of the 16 routers which MacConnell had sold, only five or six had been delivered. From August 2005 through

14

February 2006, MacConnell had deposited over $207,000 into his two bank accounts for Sonic and Myquon. The bank records also showed that MacConnell had made withdrawals from these business accounts to pay for personal expenses.

MacConnell was arraigned in Nashua District Court on March 15, 2006, represented by counsel. MacConnell told the court he was running a legitimate business and persuaded the court to reduce bail from $135,000 to $75,000 cash or surety bond. He then agreed to waive his probable cause hearing scheduled for March 23, 2006, in exchange for a further reduction of bail, to $10,000. MacConnell's conditions of bail included that he not leave the State of New Hampshire, that he remain in good behavior and that he appear in court as ordered. MacConnell also did not have access to his office equipment, computers, business files or money that was taken from his condominium and bank accounts. MacConnell alleges that these conditions prevented him from doing business, including receiving the six routers ordered from Jinan Xinhuiyou Zhongtai reflected on the March 9, 2006 invoice.

On August 15, 2006, the grand jury indicted MacConnell on the charges brought by defendants in March. Just two weeks later, on August 30, 2006, those charges were nolle prossed on

15

condition that MacConnell refund all the payments for routers
customers had not received.  On September 19, 2006, MacConnell's
property that had been seized during the March 2006 search
warrant executions was returned to him.

## 2.  Standard of Review

Summary judgment is appropriate only "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law."  Fed. R. Civ. P.
56(c).  A genuine issue is one "that properly can be resolved
only by a finder of fact because [it] may reasonably be resolved
in favor of either party."  Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 250 (1986).  A material fact is one "that might affect
the outcome of the suit."  Id. at 248.  In ruling on a motion for
summary judgment, the court construes the evidence and all
inferences reasonably drawn therefrom in the light most favorable
to the nonmovant.  See Navarro v. Pfizer Corp., 261 F.3d 90, 94
(1st Cir. 2001); Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53
(1st Cir. 2000).

The party moving for summary judgment bears the initial

16

responsibility of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the burden shifts to the nonmovant to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted."  Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996) (citing Celotex, 477 U.S. at 323 and Anderson 477 U.S. at 249).  Neither conclusory allegations, improbable inferences, nor unsupported speculation are sufficient to defeat summary judgment.  See Carroll v. Xerox Corp., 294 F.3d 231, 236-37 (1st Cir. 2002); see also Price v. Canadian Airlines, 429 F. Supp. 2d 459, 461 (D.N.H. 2006).  Summary judgment provides the means to "pierce the boilerplate of the pleadings" and "dispos[e] of cases in which no trial-worthy issue exists."  Quinn v. City of Boston, 325 F.3d 18, 28 (1st Cir. 2003) (citing Suarez, 229 F.3d at 53).

## 3.  Analysis

Defendants move for summary judgment on the four counts asserted just by MacConnell:  counts II and III which are state law claims of false arrest and malicious prosecution, count IV

17

which is a Fourth Amendment claim brought pursuant to § 1983, and count VIII which is a Second Amendment claim also brought pursuant to § 1983.  MacConnell stipulates to the dismissal of his Second Amendment claim asserted in count VIII.  See Pl.'s Obj. to Defs.' M. for Summ. J., ¶ 5 (document no. 14).  He also makes no objection to defendants' argument for summary judgment on the claims asserted in count IV against the City of Nashua. Accordingly, for the reasons set forth in defendants' brief, which are clearly sound since plaintiff has not objected to them, the § 1983 claims against the City of Nashua are also dismissed.

MacConnell objects to defendants' motion, arguing genuine issues of material fact exist about whether defendants had probable cause to arrest him, to search and seize his property, and to continue the seizure of his liberty in the form of bail restrictions and the seizure of his property while the investigation was ongoing.  He also contends there are issues of material fact with respect to the state law malicious prosecution and false arrest claims.  All three of the counts at issue here are challenges to the criminal proceedings against MacConnell. False arrest, a form of false imprisonment, and malicious prosecution are on the same continuum of torts that contend a

18

criminal proceeding was initiated and pursued against someone
without probable cause. See Wallace v. Kato, 549 U.S. 384, 389
(2007) (explaining the continuum of false arrest, false
imprisonment and malicious prosecution); see also Forgie-Buccioni
v. Hannaford Bros., Inc., 413 F.3d 175, 181 (1st Cir. 2005)
(discussing New Hampshire law on same); 32 Am. Jur. 2d § 3 (Supp.
2009) (distinguishing the torts). Similarly, a claim for a
violation of the Fourth Amendment, like MacConnell asserts here,
challenges the reasonableness of a search and seizure and whether
they were done with probable cause. See Acosta v. Ames Dep't
Stores, Inc., 386 F.3d 5, 9 (1st Cir. 2004) ("When there is
probable cause for an arrest, the Fourth Amendment's prohibition
against unreasonable searches and seizures is not offended.").
Because probable cause underlies all three claims and is the
common element threading these three counts together, that
threshold issue is analyzed first.

### a. Probable Cause

Probable cause for an arrest, a search, or the prosecution
of charges exists if the actor reasonably believes, based on
apparently trustworthy information, that a crime has been or is
about to be committed and the putative defendant was or is likely

19

to be a perpetrator. See id. (defining probable cause in the arrest context); see also United States v. Beckett, 321 F.3d 26, 31 (1st Cir. 2003) (defining probable cause to search); Forgie-Buccioni, 413 F.3d at 182 (defining probable cause under New Hampshire law in the malicious prosecution context). Probable cause is based on an objective standard that assesses whether someone of ordinary caution and prudence would "believe or entertain an honest and strong suspicion that the person arrested is guilty." Id. (internal quotation omitted); see also United States v. McFarlane, 491 F.3d 53, 56 (1st Cir. 2007) (explaining the Fourth Amendment's objective reasonableness standard). The focus of the probable cause inquiry is not on certitude, but rather whether, based on the totality of the circumstances, it is likely that criminal activity has occurred. See Acosta, 386 F.3d at 9-10 (citing Illinois v. Gates, 462 U.S. 213, 232 & n.7, 235 (1983)). Although the issue of probable cause may present a question of fact for the jury if it depends on the credibility of conflicting evidence, once those evidentiary conflicts are resolved, whether there was probable cause to support the challenged action is a question of law for the court to decide. See Forgie-Buccioni, 413 F.3d at 182 (citing Stock v. Byers, 120

20

N.H. 844, 846, 424 A.2d 1122, 1123-24 (1980)); see also Acosta, 386 F.3d at 8-9 (citing authority).

The inquiry to determine whether there is probable cause to support the issuance of a warrant is similar.[8]  "The probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Maryland v. Pringle, 540 U.S. 366, 370 (2003).  A warrant application must be reviewed by a judicial officer, who may find probable cause exists to issue the warrant if "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place," Gates, 462 U.S. at 238, or that there is a reasonable basis to believe the suspect committed a crime. Samos Imex Corp. v. Nextel Commc'ns, Inc., 194 F.3d 301, 303 (1st Cir. 1999) (comparing the lower standard of probability required

_____

[8]The Fourth Amendment guarantees that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV. Accordingly, "'[a]ny search intruding upon [an individual's] privacy interest must be justified by probable cause and must satisfy the particularity requirement, which limits the scope and intensity of the search.'"  United States v. Woodbury, 511 F.3d 93, 97 (1st Cir. 2007) (quoting precedent).

21

by the Fourth Amendment to the civil preponderance standard).
Only a probability or a substantial chance, not a prima facie or
actual showing, of criminal activity is needed to justify the
issuance of a warrant.  See Gates, 462 U.S. at 238; see also
United States v. Syphers, 426 F.3d 461, 464 (1st Cir. 2007).
Moreover, an issuing judge's determination of probable cause is
accorded "great deference," Gates 462 U.S. at 236, and will be
upheld even "in a doubtful or marginal case.'" United States v.
McMullin, 568 F.3d 1, 6 (1st Cir. 2009) (quoting United States v.
Zayas-Diaz, 95 F.3d 105, 111 (11th Cir. 1996)).

       The undisputed facts here overwhelmingly support Judge
Leary's findings that probable cause existed both to arrest
MacConnell and to search his property.  "Probable cause to obtain
an arrest warrant exists when police have knowledge of facts and
circumstances grounded in reasonably trustworthy information and
sufficient in themselves to warrant a belief by a prudent person
that an offense has been committed." Gidley v. Oliveri, __ F.
Supp. 2d __, 2009 WL 1810762, *8 (D.N.H. June 25, 2009) (citing
Beck v. Ohio, 379 U.S. 89, 91 (1964) and Wong Sun v. United
States, 371 U.S. 471, 479 (1963)).  Maher's affidavit sets forth
in detail how MacConnell had solicited orders from at least nine

                                22

customers, all of whom had paid for CNC routers with checks that MacConnell had deposited personally into his bank accounts, yet none had received the product ordered. The investigation began in response to complaints filed by two disgruntled customers, and his research verified their stories. He also received a referral from the NW3C, a national clearinghouse for internet fraud related complaints. Maher's work revealed a trail of shady business practices, from the misrepresentations on Sonic's website and the problems MacConnell had with American Sign and Hyatt up to the current complaints. Maher confirmed MacConnell's identity with surveillance photographs from the bank, New Hampshire state driver's license records and New Hampshire's Employment Security records. Finally, Maher relied on a private investigator's report whose independent research corroborated Maher's belief that MacConnell was misusing customer's funds for his private use rather than for legitimate business purposes. These facts were clearly set forth in the affidavit supporting his request for an arrest warrant and easily demonstrate, based on the totality of the circumstances, a probability that MacConnell was stealing his customers' money. The arrest warrant for the charges of Theft by Unauthorized Taking or Transfer, see

23

RSA 637:3, and for Theft by Deception, see RSA 637:4, was
certainly supported by probable cause.

Maher's applications for warrants to search the 53 Burgundy
condominium and MacConnell's bank accounts were similarly
supported by detailed facts that connected the suspected criminal
activity to the premises. "A warrant application must
demonstrate probable cause to believe that (1) a crime has been
committed – the "commission' element, and (2) enumerated evidence
of the offense will be found at the place to be searched – the
so-called 'nexus' element." McMullin, 568 F.3d at 6 (citing
precedent). In addition to repeating and expounding on the facts
set forth in the arrest warrant application, the search warrant
applications provided additional names of customers whose money
had been taken[9], explained Maher's evidence that MacConnell
resided at 53 Burgundy Way in Nashua, that was owned by McGough,
who worked at the Sweeney law offices where the checks had been
sent. The affidavit also explained that Sonic's principal place
of business was that address, and that both its and Myquon's
registered agent was MacConnell, who lived there with McGough as
his roommmate. These facts substantiated Maher's belief that

_____

[9]Maher's affidavit indicated that over $85,000 had been
collected yet not one router had been sent.

24

MacConnell was operating his fraudulent CNC router sales business from that address and reasonably supported the probability that some evidence of the thefts would be found there and in the bank accounts where MacConnell had deposited checks. Judge Leary's finding of probable cause to search the condominium and bank account records certainly deserves deference based on the undisputed facts before me.

Three more searches occurred, which also were justified either because of probable cause or consent. During the search of the condominium, defendants discovered what appeared to be a rifle, which prompted Maher to file another warrant application specifically to search for a firearm. Like the other warrant applications, his affidavit specified in detail the reasons he suspected MacConnell had a gun and the record evidence that made it illegal for him to possess one.[10] Again that application was reviewed by Judge Leary, who issued the warrant after finding

_____

[10]During his investigation Maher had done a criminal records check and found that MacConnell was convicted of felony larceny in Virginia on December 1, 1989. While MacConnell argues now that his conviction was expunged, rendering his possession of a gun legal, that evidence is irrelevant to the question of probable cause, which focuses on what Maher knew at the time he sought the warrant application. See Syphers, 426 F.3d at 464 (explaining the probability required for probable cause does not demand "an airtight case before taking action").

probable cause to believe MacConnell may have violated RSA 159:3,
which forbids convicted felons from possessing a firearm, and
that evidence of the crime was likely to be found in the
condominium.  In fact, defendants found and seized MacConnell's
rifle.  Finally, MacConnell consented to the searches of his
office and car.[11]  Because consent is "one of the specifically
established exceptions to the [Fourth Amendment] requirements of
both a warrant and probable cause," Schneckloth v. Bustamonte,
412 U.S. 218, 219 (1973), and MacConnell does not allege that
defendants exceeded the scope of the consented-to searches, the
question of probable cause to support either the office or car
search was eliminated.  See United States v. Turner, 169 F.3d 84,
87 (1st Cir. 1999) (requiring search to be objectively reasonable
within the scope of the consent).

The undisputed record contains substantial evidence to
support Judge Leary's findings of probable cause to issue the
arrest and search warrants that initiated the criminal

---

[11]The record is unclear about the relationship between
MacConnell's office at the Sweeney law offices at 6 Manchester
Street, which he explicitly consented to having searched, and the
Law Warehouse on Airport Road, which defendants visited to
confirm MacConnell had routers there, apparently with his consent
but for which there is not a separate search warrant.  As
MacConnell has not objected to the search of the Law Warehouse,
the ambiguity is immaterial to the analysis here.

26

proceedings against MacConnell.  The affidavits and applications need only show a probability or substantial chance of criminal activity, not an actual showing of such activity.  See Syphers, 426 F.3d at 465-66; see also Acosta, 386 F.3d at 10 ("there is no requirement that the officer corroborate every aspect of every complaint with extrinsic information").  The evidence of multiple cashed checks, of many dissatisfied current and former customers all complaining of a similar pattern of having paid substantial sums of money with no corresponding delivery of product, of using deceptive pseudonyms, of misusing customer funds at Hyatt, and of no reported income yet several expensive possessions, combined to show facts and circumstances which reasonably created an honest and strong suspicion that MacConnell was involved in the charged criminal activity.  See Forgie-Buccioni, 413 F.3d at 182 (describing the objective standard used to find probable cause); see also McMullin, 568 F.3d at 7 (affirming "that police officers can justifiably rely upon the credible complaint by a victim to support a finding of probable cause" (internal quotation omitted)).  I find, based on the undisputed facts of before me, that the warrants to arrest MacConnell and to search his property were supported by probable cause.

27

### b. MacConnell's State Claims

Having concluded that the challenged warrants were supported by probable cause, MacConnell's two state claims for false arrest and malicious prosecution can be disposed of summarily.

To be found liable on a claim for false arrest, defendants must have unlawfully arrested MacConnell, in other words, they must not have had probable cause to arrest him. See Forgie-Buccioni, 413 F.3d at 179 (discussing false arrest under New Hampshire law). An arrest made pursuant to a properly issued warrant by an officer charged with the duty of enforcing it is legal. See id. (citing 1 Restatement (Second) of Torts, § 45A (1965)); see also RSA 594:7 (2001) (providing that an officer with a warrant for the arrest of an offender has "power to make the arrest at any time and in any place"). Defendants had lawful authority to arrest MacConnell in the form of the valid warrant they had obtained from Judge Leary. See Gidley, 2009 WL 1810762 at *11 (dismissing false arrest and false imprisonment claims because defendant's warrant gave him lawful authority to proceed). Accordingly, MacConnell has no claim for false arrest and defendants' motion for summary judgment on this claim is granted. See Wallace, 549 U.S. at 390 (explaining that false

28

arrest claims end once process issues); see also Welch v. Bergeron, 115 N.H. 179, 181, 337 A.2d 341, 343 (1975) ("An essential element of the offense is absence of valid legal authority for the restraint imposed."); see also Rest. 2d Torts § 122 (arrest under a warrant is privileged if warrant is facially valid).

To succeed on his malicious prosecution claim, MacConnell must prove that defendants instituted the criminal proceedings against him without probable cause and with malice, and that the criminal proceedings terminated in his favor. See Forgie-Buccioni, 413 F.3d at 182 (citing New Hampshire law); see also Martin v. Applied Cellular Tech., Inc., 284 F.3d 1, 7 (1st Cir. 2002) (same). As discussed at length above, MacConnell has not established any facts that undermine or call into question the probable cause Judge Leary found. To the contrary, the evidence strongly supports a finding of probable cause for the theft charges lodged against MacConnell, which defendants honestly and reasonably suspected based on Maher's investigation. See Martin, 284 F.3d at 8 (finding probable cause to undermine plaintiff's malicious prosecution claim where police performed a "reasonably thorough and independent investigation" and a state court issued

a warrant based on evidence).

Even if MacConnell had succeeded in casting some doubt on the probable cause findings, his malicious prosecution claim founders because the underlying proceedings did not terminate in his favor. See Robinson v. Fimbel Door Co., 113 N.H. 348, 350, 306 A.2d 768, 769 (1973) (holding that a nolle prossed proceeding reached as a compromise between the plaintiff and the defendant is not a favorable termination for purposes of establishing a malicious prosecution claim).

> By the overwhelming weight of authority, where the prior proceeding was ended by a compromise or settlement, voluntarily and understandingly consummated by the accused, there is not such a favorable termination as will support the action. . . . To show a termination in his favor, the plaintiff must prove that the court passed on the merits of the charge or claim against him under such circumstances as to show his innocence or nonliability, or show that the proceedings were terminated or abandoned at the instance of the defendant under circumstances which fairly imply the plaintiff's innocence.

Id. at 350-51 (citing authority). This rule is still valid. See Paul v. Sherburne, 153 N.H. 747, 752, 903 A.2d 1011, 1015-16 (2006) (distinguishing facts from Robinson to explain how court's dismissal of stalking charges when accuser failed to appear was a favorable termination). "The prevailing view is that if the

30

abandonment was the result of a compromise to which the accused agreed, . . . it is not a termination in favor of the accused for purposes of a malicious prosecution claim." Murphy v. Lynn, 118 F.3d 938, 949 (2d Cir. 1997). It is undisputed that the charges against MacConnell were nolle prossed on August 30, 2006 in exchange for his agreement to refund all the money he had taken. This type of compromise is not the favorable termination required to prove a malicious prosecution claim; therefore, defendants' motion for summary judgment on this claim is granted.

### d. Fourth Amendment Violations

MacConnell's Fourth Amendment claims asserted in Count IV make no more head way than his state law challenges to the criminal proceedings. As explained supra, there was probable cause to arrest MacConnell and search his property, rendering the actions in March 2006 constitutional. In response to defendants' motion for summary judgment, MacConnell rephrases his Fourth Amendment claim to include a challenge to his continued seizure during the five month period he was subject to bail conditions, contending defendants were obligated to acknowledge they lacked probable cause to pursue the prosecution once their investigation revealed he was operating a legitimate business. This argument

31

fails for several reasons.

First, MacConnell does not allege any claim for an unlawful seizure of himself based upon his bail conditions. Count IV is explicitly limited to the alleged improper search and seizure surrounding his March 14, 2006, arrest. As he put it:

> Under the totality of the circumstances, it was not reasonable for the defendants to believe that they had probable cause to search Mr. MacConnell's property, seize Mr. MacConnell's property, or retain possession of Mr. MacConnell's property for the period of time during which that property was retained. Likewise, it was not reasonable for defendants to believe that they had probable cause to arrest Mr. MacConnell.

Declaration, MacConnell, et al. v. City of Nashua, et al., No. 07-C-431 (Hillsborough Superior Court, Sept. 13, 2007), ¶ 76. His reference to the retention of his property while the charges were being prosecuted cannot reasonably be understood to include a claim for unconstitutional seizure of himself during that same five month time period.

Second, MacConnell erroneously argues he was seized on less than probable cause because the information obtained shortly after his arrest demonstrated he did not have the mental intent to permanently deprive as required to support the theft charges

32

against him.[12] Defendants did not have a duty to explore

exculpatory evidence or investigate potential defenses before

finding probable cause to arrest him. See Acosta, 386 F.3d at 11

(citing Barber v. Page, 390 U.S. 719, 725 (1968) and Baker v.

McCollan, 443 U.S. 137, 145-46 (1979)). Nor were defendants

required to investigate following their interview with MacConnell

based on the possibility that some alternative explanation may

exist for the evidence they had. See id.; see also Thompson v.

Olson, 798 F.2d 552, 556 (1st Cir. 1986) (recognizing that delay

in processing charges risks claims of false imprisonment). As

soon as MacConnell was arraigned, responsibility for the criminal

proceedings shifted to the prosecutor, over whom defendants had

no control and for whose decisions defendants cannot be held

liable. See Cignetti v. Healy, 89 F. Supp. 2d 106, 113-15 (D.

---

[12]Based on the undisputed record before me, rather than
yielding exculpatory information, defendants' investigatory work
substantiated the probable cause that supported Maher's initial
suspicions. During his interview the night of his arrest,
MacConnell admitted he had used pseudonyms, had misrepresented
his business on Sonic's website, did not know how many orders
were outstanding and could not explain where the money had gone.
The search of MacConnell's bank records showed that $82,895 had
been deposited in Sonic's bank account between December 5, 2005
and February 27, 2006, and $124,516 had been deposited in
Myquon's bank account between August 17 and December 21, 2005.
During this time, the records also showed that only $44,186 had
been transferred to MacConnell's Chinese supplier, leaving
$163,225 at MacConnell's disposal.

33

Mass. 2000) (discussing immunity that attaches when investigative work shifts over to prosecutorial work for judicial proceedings). "'[A]n affirmative duty to release arises only if the arresting officer ascertains beyond a reasonable doubt that the suspicion (probable cause) which forms the basis for the privilege to arrest is unfounded.'" Thompson, 798 F.2d at 556 (quoting Rest. Torts 2d, § 134, Comment f). In addition to the corroborating evidence identified above, the grand jury's indictment on August 15, 2006, clearly establishes that the probable cause to seize MacConnell was not unfounded beyond a reasonable doubt.

Third, the two cases on which MacConnell relies to argue his bail conditions constituted an unreasonable seizure of himself are neither controlling nor persuasive. See Gallo v. City of Philadelphia, 161 F.3d 217 (3rd Cir. 1998); Murphy v. Lynn, 118 F.3d 938 (2d Cir. 1997). In a lengthy discussion of these cases and whether or not a claim can be made for the constitutional tort of malicious prosecution, the First Circuit makes clear that, if such a claim were to succeed, it would need to prove that an unconstitutional seizure resulted from the prosecution. See Nieves v. McSweeney, 241 F.3d 46, 54-57 (1st Cir. 2001) (explaining that it is the Fourth Amendment's protection against

seizure without probable cause, not prosecution without probable cause, that would be actionable under § 1983); see also Britton v. Maloney, 196 F.3d 24, 28-29 (1st Cir. 1999) (same). The court explicitly rejected Justice Ginsburg's reasoning in Albright v. Oliver, 510 U.S. 266 (1994), that held a person released pending trial is still "seized" because such person "is scarcely at liberty . . . so long as he is bound to appear in court and answer the state's charges," id. at 279. See Nieves, 241 F.3d at 56 (noting that no other justice joined her opinion and following three other circuits to reject this reasoning). Instead, the court explained that some restrictions on liberty imposed by pretrial conditions of bail may rise to the level of a constitutional violation, but that ordinary requirements of appearing in court do not pass muster. See id. at 56-57 (holding that "the relatively benign conditions" of appearing in court are not "the physical control and termination of freedom of movement" that may constitute a seizure within the meaning of the Fourth Amendment); see also Britton, 196 F.3d at 30 (same).

MacConnell argues that his restrictions were like those in Gallo and Murphy, because he had to post bail and was prohibited from leaving the state. While the First Circuit may acknowledge

35

that an imposition on the fundamental right to travel pending
trial, under the right circumstances, could be deemed an
unconstitutional seizure, see Nieves, 241 F.3d at 57, I decline
to make such law on the facts presented here.  Unlike the
plaintiffs in Gallo and Murphy, whose underlying criminal
prosecutions were initiated without probable cause and were
pursued with malice[13], rendering the pretrial liberty deprivation
more egregious, MacConnell's charges were based on an honest and
legitimate investigation done in response to victims' complaints.
There was probable cause to pursue the criminal charges and they
did not end in his favor.  The facts simply do not reek of
abusive governmental power or insidious investigative tactics
that can result in liberty restrictions like those that the Gallo
and Murphy courts found to be seizures in violation of the Fourth
Amendment.  Such facts are not before me.

---

[13]In Gallo, the evidence showed that the fire marshal had
altered his initial report after pressure from the insurance
carrier and that governmental officials had withheld this
exculpatory evidence.  See id., 161 F.3d at 222-25.  In Murphy,
the evidence showed the defendant policeman had no reason to have
arrested plaintiff other than perhaps a racial animus, used
excessive force to effect the underlying arrest, and lied to the
grand jury about the events surrounding the arrest.  See id., 118
F.3d at 947-50.  In both cases the underlying criminal
proceedings terminated in plaintiff's favor.

36

I find the facts indisputably establish that MacConnell has no claim for unconstitutional search or seizure. Defendants' motion for summary judgment on the Fourth Amendment claims is granted.

## Conclusion

For the reasons set forth above, defendants' motion for summary judgment (document no. 10) is granted. The clerk is ordered to enter judgment dismissing Counts II, III, IV and VIII in their entirety.

The remaining counts assert only state law claims; however, considering the matter has progressed beyond summary judgment and is rapidly approaching trial, I believe, based on considerations of judicial economy, convenience and fairness to the parties, that the better course is to continue to exercise this court's supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a). See Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 256-57 (1st Cir. 1996) (discussing court's discretionary powers to exercise supplemental jurisdiction).

37

**SO ORDERED.**

James R. Muirhead
United States Magistrate Judge

Date:    August 14, 2009

cc:    Richard Lehmann, Esq.
       Brian J.S. Cullen, Esq.